UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARGARITE CONSOLMAGNO     :
     Plaintiff,       :
                        :
v.                      :     CIVIL ACTION NO. 3:11CV00109 (DJS)
                        :
                        :
HOSPITAL OF ST. RAPHAEL SCHOOL :
OF NURSE ANESTHESIA and     :
ANESTHESIA ASSOCIATES OF NEW :
HAVEN, P.C.               :
     Defendants.      :

<u>MEMORANDUM OF DECISION AND ORDER</u>

The plaintiff, Margarite Consolmagno ("Consolmagno"), brings this action alleging

unlawful employment discrimination practices by the defendants, the Hospital of St. Raphael

School of Nurse Anesthesia ("St. Raphael's School"), and Anesthesia Associates of New Haven,

P.C. ("Anesthesia Associates") (collectively "the School").  A third defendant, the Hospital of St.

Raphael ("the Hospital"), was previously dismissed from this action by the Court (Dorsey, J.)

pursuant to a motion to dismiss filed by the Hospital.  Specifically, Consolmagno alleges

employment discrimination on the basis of sex and illegal retaliation in violation of Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), giving rise to a federal

question and conferring jurisdiction upon this Court pursuant to 28 U.S.C. § 1331.

Now pending before the Court is the defendants' motion for summary judgment, in which

the defendants contend that they are entitled to summary judgment because Consolmagno was

not their employee and is thus barred from recovering under Title VII as a matter of law.

Alternatively, the defendants contend that they are entitled to summary judgment on the

plaintiff's retaliation claim because Consolmagno was dismissed from St. Raphael's School due to her sub-par academic performance and not in retaliation for reporting an inappropriate sexual advance by another staff member.  Finally, the defendants seek summary judgment with respect to the plaintiff's demand for lost future earnings, arguing that whether Consolmagno would have become an employed Certified Registered Nurse Anesthetist ("CRNA") is unduly speculative.

For the reasons stated below, the defendants' motion for summary judgment **(doc. # 85)** is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

Consolmagno obtained a nursing degree in 1990 and a masters degree in nurse anesthesia in 1996. The combination of these two degrees and the successful completion of a clinical program qualified Consolmagno to sit for the National Certification Exam ("the NCE"), the final step required to become a CRNA[1].  Between 1997 and 2008 Consolmagno took and failed the NCE sixteen times.

In 2007 the governing body charged with administering the NCE, the National Board of Certification and Recertification for Nurse Anesthetists ("the National Board"), instituted a new policy that had the effect of precluding Consolmagno from retaking the NCE unless she completed a new nurse anesthesia educational program, including both academic and clinical components. Through her attorney, Consolmagno subsequently petitioned the National Board to allow her to retake the exam after repeating only the clinical portion of her training.

---

[1]CRNAs assist in the delivery of anesthesia to patients undergoing surgery.

Dr. David Van Ess ("Van Ess"), Consolmagno's former tutor, assisted her with the petition to the National Board.  Van Ess was an anesthesiologist at Anesthesia Associates and a member of the faculty at St. Raphael's School.  In a letter dated February 28, 2009, Van Ess stated that St. Raphael's School was "prepared to offer Ms. Consolmagno a full course of clinical retraining."  (Doc. # 93, at 69). After listing the various courses that St. Raphael's School offered at the clinical level, Van Ess noted that "[c]omprehensive testing of the aforementioned material is given with a minimum passing grade of 78% in each subject." (*Id*.).

On May 8, 2009, the National Board agreed to let Consolmagno retake the NCE once she had successfully completed the proposed plan of study at St. Raphael's School, which omitted the pre-clinical period of study: "Should Ms. Consolmagno, within twenty-four (24) months after the date of this letter, successfully complete the planned program of study/education outlined in your letter . . . she will be granted three (3) months in which she may sit for the NCE one (1) more time." (Doc. # 87-6, at 51).

After the National Board's approval of the plan, Consolmagno sought formal admission to St. Raphael's School, which maintains an academic and clinical training program to train nurse anesthetists  ("the Program"). St. Raphael's School is owned and operated by Anesthesia Associates.  St. Raphael's School permitted Consolmagno to enroll in the Program as a favor to Van Ess, who was attempting to assist Consolmagno in her effort to pass the NCE. At some point prior to Consolmagno's enrollment in the Program, Van Ess told her that "he didn't think it was a good idea to ask for a stipend" or health insurance. (Doc. # 91, at 38:23-24, 39:2-4).  At the time, St. Raphael's School ordinarily provided each Program participant with health insurance and a stipend of $125 per week. St. Raphael's School did not provide or offer health insurance or a

stipend to Consolmagno.  She was unaware that Program participants ordinarily received health insurance and a stipend until after she enrolled in the Program and received a copy of the St. Raphael School Handbook which specified the policies of St. Raphael School in that regard.

Although Consolmagno did not go through the normal application procedures, her candidacy for admission to the Program was approved by Dr. Philip J. Noto ("Noto"), who was the President of Anesthesia Associates and the Medical Director of St. Raphael's School. Her candidacy also was approved by Program Director Judy Thompson ("Thompson") and Assistant Program Director Marianne Cosgrove ("Cosgrove").

The question of Consolmagnos's admission into the Program was addressed at a meeting of Anesthesia Associates held on February 10, 2009. The minutes from Anesthesia Associates' February 10, 2009 corporate meeting include the following notation: "Van Ess works with a student (Margurite) [sic] to try and help her pass her boards - - should we hire her with (a)  2 year contract and no sign on bonus or (b) 1 year contract with no pay as necessary requirement for board eligibility? *Noto will make decision."[2]  (Doc. # 92, at 26.)  Van Ess also sent Consolmagno an email on May 11, 2009, congratulating her on her admission to the Program and further stating that "[u]pon graduation, you will be offered employment by Anesthesia Associates of New Haven."  (Doc. # 92, at 70).

Consolmagno and her fellow Program participants began St. Raphael School's clinical program in late May 2009.  At that time Consolmagno knew St. Raphael's School would not be providing her with a stipend or health insurance. On June 5, 2009, Consolmagno signed a series

---

[2]Noto testified at his deposition that he thought the word "hire" was a typo and that "they meant should we admit her as a special student to the school." (Doc. 90, at 22:1-10).

of acknowledgments indicating that she had read and understood the "Hospital of Saint Raphael, School of Nurse Anesthesia Student Handbook" ("the Student Handbook"), that she had read, understood, and accepted "the examination policy of the Hospital of St. Raphael, School of Nurse Anesthesia . . . as the final decision regarding continuing in the program," and had read and accepted  "the clinical practicum policy of advancement and probation and dismissal of the Hospital of St. Raphael, School of Nurse Anesthesia."  (Doc. # 92, at 30,32.)  The Student Handbook contains information about benefits that Program participants receive, including information concerning the provision of a weekly stipend and health insurance. Consolmagno did not question why she was being denied the stipend and health insurance benefits being provided to other Program students because she "[d]idn't want to make waves for myself." (Doc. # 91, at 39:17-21).

Although Consolmagno did not receive a stipend or health insurance, she was covered under a student professional liability malpractice insurance policy while she was enrolled in the Program.[3]  Other benefits provided to Program participants, as stated in the Student Handbook, included three weeks of vacation time and eight sick days during the seventeen-month clinical phase.  The sick leave policy also contained provisions related to workers' compensation and advised Program participants that they should make all efforts to have another student cover their shift if they were out sick.

According to Thompson, the Program Director, the Program is "like a residency" and "students . . . participate in the administration of anesthesia with our anesthesiologists and

---

[3] Whether Ms. Consolmagno truly "received" malpractice insurance or whether she in fact paid for her own insurance premium as part of an enrollment fee that she paid to the school is disputed.

certified nurse anesthetists . . . doing all kinds of cases that are done at the Hospital of St. Raphael to learn to administer anesthesia." (Doc. # 89, at 9:21-25, 10:1). During her time in the Program, Consolmagno spent the majority of her time "preparing the operating rooms to which I would be assigned, meeting with patients prior to surgery and the actual performance of anesthesia services upon those patients during the ensuing surgery." (Doc. # 94, at 3, ¶ 5). The School assigned Consolmagno to the specific cases she worked on and provided the instrumentalities she used in the course of her work.

In addition to working on clinical cases, Consolmagno and her fellow Program participants were also required to complete a classroom program of study for which they attended lectures and took a series of examinations. The Student Handbook included a section on "Academic Probation Policy/Exam Pass Rate Policy" pertaining to the examinations taken by Program students. (Doc. # 92, at 18). The minimum passing score on these exams was a 78 percent. If a student did not pass an exam she was given an oral "retake" of that exam within two weeks of the failed exam. If the student failed the retake she was placed on academic probation. If the student passed the oral retake she was not placed on academic probation. If a student subsequently failed a second exam, however, she was automatically placed on academic probation. In that event, the student was given a written retake of that exam. The original exam score was then averaged with the written retake score. If the average of the two exams was over 78 percent the student remained on probation until the next exam. If the student passed the next exam she was taken off of probation. However, if the student failed the next exam (which would be the third failed exam), she was dismissed from the program. There was no opportunity to retake the third failed exam.

Consolmagno passed her first two exams but failed the next exam, Pharmacology I, on August 3, 2009.  In accordance with the applicable policy Consolmagno was given an oral retake of the Pharmacology I exam, which she passed. Consolmagno took her next exam, Pharmacology II, on September 2, 2009. She failed that exam, making it the second exam that she had failed. Consolmagno was automatically  placed on academic probation at that point in accordance with the provisions of the Student Handbook.

On September 4, 2009, a man named Odeed Geismar ("Geismar") approached Consolmagno near the Hospital's parking garage and "took his fingers and . . . went from . . . the top of [her] neck down into [her] breasts"  (Doc. # 91, at 3:21-25, 4:1-10).[4]  Geismar is a CRNA employed by Anesthesia Associates. In addition to performing anesthesia services in the Hospital, Geismar sits on the admissions committee of St. Raphael's School and supervises Program students during the course of their clinical training. Geismar was one of Consolmagno's supervisors in the Program.

On September 8, 2009, Consolmagno reported the incident involving Geismar to Thompson, who responded by saying, "it's your word against his. What do you want me to do about this?"  (*Id.* at 27:25, 28:1). Thompson subsequently informed Noto of Consolmagno's complaint and Noto thereafter met with Geismar and Thompson and asked Geismar if he had done what Consolmagno said he did. Geismar denied touching Consolmagno in an inappropriate manner. Noto "counsel[ed] Odeed that if indeed any of this might be true that he was to behave like a gentleman at all times like he always has." (Doc. # 99, at 31, p. 124:18-20). Noto

---

[4]In ruling on a motion for summary judgment the Court "resolve[s] disputed facts in favor of the non-moving plaintiff where there [is] evidence to support [her] allegations." *Sousa v. Roque*, 578 F.3d 164, 166 n.1 (2d Cir. 2009).

subsequently contacted the director of security for the Hospital and asked to see footage from a security camera located near the parking garage that was recorded on the day in question. Noto was advised that the footage was not available because it had been erased. Noto did not speak to Consolmagno about her complaint.

Later on September 8, 2009, Consolmagno met with Thompson and signed a probationary form relating to her failing score on the Pharmacology II exam. Consolmagno subsequently took and passed a written retake of that exam. Because she had failed exams on two occasions, however, Consolmagno remained on academic probation until her next scheduled exam. At some point while Consolmagno was participating in the Program, Thompson told Consolmagno she should go elsewhere to complete her clinical training.

On October 13, 2009, Consolmagno took her next exam, Special Topics, which was an exceptionally difficult one. Half of the fourteen Program participants who took the test received raw scores lower than 78. Consolmagno received a raw score of 61 on the Special Topics exam. St. Raphael's School has a practice, known as an "item analysis," of reviewing questions following an examination and determining whether any adjustment should be made to the students' raw scores on the basis of faulty questions. (Doc. # 98, at 56:1-10). Thompson testified at her deposition that "if the question is flawed, and we determine that it's flawed, we usually take it out." (*Id.* at 47:23-24). In an October 15, 2009 email to Consolmagno, Cosgrove stated that, "After careful consideration of the item analysis of the Special Topics Exam, we have decided to remove 9 questions and apply that to everyone's raw score. We felt that it would be the most equitable way to deal with the fact that it was a difficult exam." (Doc. # 93, at 39).

On an exam tally sheet indicating how many Program participants got each question wrong on the Special Topics exam was written the following calculation: 61 + 9 = 70. When asked at her deposition why the only score noted on the exam tally sheet was Consolmagno's, Thompson responded, "I can't answer that question." (Doc. # 98, at 76:18-20). That same tally sheet indicates that eighteen of the one hundred exam questions were answered incorrectly by at least half of the participants taking that exam (Doc. # 93, at 41). The item analysis of the Special Topics exam resulted in Consolmagno receiving a final score of 70 (the raw score of 61 plus the 9 points added to everyone's raw score). Under St. Raphael's School policy this was still a failing grade. While seven of the fourteen students who had taken the Special Topics exam had raw scores lower than 78, Consolmagno was the only student who ultimately received a failing score.

Another student who had received a raw score of 68 on the Special Topics exam would have had a failing grade with the additional 9 points added to each student's raw score (68 + 9 = 77). An additional point was added to that student's score so that the final grade was a 78, which was the minimum passing score. When asked at her deposition if she could explain why that student was awarded an additional point to get to a total score of 78, Thompson responded, "No, I can't." (Doc. # 98, at 79:13-17). In a supplemental affidavit filed seven months after her deposition, Thompson indicated that three students were awarded one additional point because they had answered a particular question (Question No. 95) incorrectly, but had chosen an answer that "could have potentially been a correct answer." (Doc. # 109-1, at 5, ¶ 30). Thompson further indicated that "Ms. Consolmagno did not answer Question No. 95 incorrectly. As such, she did not receive an additional point for Question No. 95." (Id. at 5, ¶ 31).

On October 15, 2009, Consolmagno was dismissed from the Program. She subsequently

filed a complaint with the Equal Employment Opportunity Commission and received a notice of

right to sue on or about January 4, 2011.  Consolmagno then filed this action on January 20,

2011.

## II.  DISCUSSION

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  "[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial."  *Redd v. N.Y. State Division of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (internal

quotation marks omitted).  In making that determination, the Court must "construe the evidence

in the light most favorable to the non-moving party and . . . draw all reasonable inferences in its

favor."  *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal quotation marks

omitted).

"The moving party bears the burden of showing that he or she is entitled to summary

judgment."  *Id.* at 69.  The movant can satisfy that burden by "point[ing] to an absence of

evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of

Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "If the party moving for

summary judgment demonstrates the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that would be

sufficient to support a jury verdict in its favor."  *Burt Rigid Box, Inc. v. Travelers Property*

-10-

*Casualty Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).  "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  *American Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted).

### B.  The Plaintiff's Employment Status

The threshold issue in this case is whether Consolmagno was an employee of Anesthesia Associates or St. Raphael's School.  If Consolmagno was not an "employee" as defined by Title VII then her action cannot be maintained. *See Tadros v. Coleman*, 717 F. Supp. 996, 1002 (S.D.N.Y. 1989) (Title VII is "available only to employees (or prospective employees) seeking redress for the unlawful employment practices of their employers").

### i.  Legal Standard

Title VII defines an employee as "an individual employed by an employer . . . ."  42 U.S.C. § 2000e(f).[5]  When Congress uses the term  "employee" without concretely defining it, the Supreme Court has held that Congress "intended to describe the conventional master-servant relationship" found in common law agency doctrine.  *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) (internal quotation marks omitted).

Against this backdrop, the Second Circuit has articulated a two-part test for determining whether an individual is an employee within the meaning of Title VII.  *See O'Connor v. Davis*,

---

[5] The Court finds that the defendants qualify as employers under Title VII.  Anesthesia Associates, which employs forty nurse anesthetists qualifies because it is "engaged in an industry affecting commerce [and has more than] fifteen . . . employees for each working day [during at least twenty weeks out of the year] . . . ."  42 U.S.C. § 2000e(b).  St. Raphael's School, which is owned by Anesthesia Associates, qualifies as an employer under the single employer status rule even if it does not independently employ more than fifteen individuals.  *See e.g.*, *Linskey v. Heidelberg Eastern, Inc.*, 470 F. Supp. 1181, 1184 (E.D.N.Y. 1979) (a plaintiff pursuing a Title VII claim "may seek to prove that the activities between and management of the parent corporation and its subsidiary were so closely related as to constitute an integrated enterprise").

126 F.3d 112, 115-16 (2d Cir. 1997) (articulating the relevant test).  First, courts determine

whether the plaintiff "received direct or indirect remuneration from the alleged employer."

*Pietras v. Board of Fire Commissioners*, 180 F.3d 468, 473 (2d Cir. 1999) (internal quotation

marks omitted).  Remuneration is broadly defined, and "a person need not receive wages in order

to be considered an employee under Title VII."  *United States v. City of New York*, 359 F.3d 83,

97 (2d Cir. 2004).  Benefits such as "health insurance; vacation; sick pay; *or the promise of any*

*of the foregoing*" can be indicative of a financial benefit that may constitute remuneration. *York*

*v. Association of the Bar of the City of New York*, 286 F.3d 122, 126 (2d Cir. 2002) (emphasis

added).

If a plaintiff demonstrates a financial benefit sufficient  to satisfy the essential condition

of remuneration, the court then applies the second part of the *O'Connor* analysis, the traditional

common-law agency test as articulated in *Community for Creative Non-Violence v. Reid*.  490

U.S. 730, 751-52 (1989):

> In determining whether a hired party is an employee under the general common
> law of agency, we consider the hiring party's right to control the manner and
> means by which the product is accomplished.  Among the other factors relevant to
> this inquiry are the skill required; the source of the instrumentalities and tools; the
> location of the work; the duration of the relationship between the parties; whether
> the hiring party has the right to assign additional projects to the hired party; the
> extent of the hired party's discretion over when and how long to work; the method
> of payment; the hired party's role in hiring and paying assistants; whether the
> work is part of the regular business of the hiring party; whether the hiring party is
> in business; the provision of employee benefits; and the tax treatment of the hired
> party.

### ii. Students And Title VII

By its terms, Title VII protects employees, not students.  42 U.S.C. §2000e.  "Student"

and "employee" are not, however, mutually exclusive categories under Title VII.  *See Cuddeback*

*v. Florida Board of Education*, 381 F.3d 1230, 1234-35 (11th Cir. 2004) (finding that a graduate student assistant who, among other things, received a stipend and other benefits, such as sick leave and vacation time, was an employee for Title VII purposes); *see also Ivan v. Kent State University*, 863 F. Supp. 581, 586 (N.D. Ohio 1994) ( "The totality of the circumstances of [the plaintiff's] graduate assistantship demonstrates she was an employee under the terms of Title VII."). Nevertheless, not all students are employees under Title VII.  *See O'Connor* 126 F.3d at 116 (a student intern who received  "no salary . . . and no employee benefits such as health insurance, vacation, or sick pay, nor was . . . promised any such compensation" was not an employee because she failed to meet the remuneration requirement).

Ultimately, "Title VII can encompass . . . mixed educational and employment relationships, including postgraduate medical training . . . and graduate student education." *Consolmagno v. Hospital of St. Raphael*, Civ. No. 3:11cv109 (PCD), 2011 U.S. Dist. LEXIS 116999, at *16 (D. Conn. Oct. 11, 2011) (citation omitted). While the Court recognizes that many students may not be able to satisfy the *O'Connor* test's requirements, those who do are entitled to Title VII's protections.

### iii.  *O'Connor* and *Tadros*' Bearing On This Case

The defendants argue that *O'Connor* and *Tadros v. Coleman*, 898 F.2d 10 (2d Cir. 1990) preclude a finding that Consolmagno was an employee.  The Court, however, finds significant factual differences between those cases and the instant action.

In *O'Connor* a college student working two days a week as an intern at a hospital for the mentally disabled in order to satisfy a university degree requirement brought a Title VII suit against the hospital after being sexually harassed.  *O'Connor*, 126 F.3d at 113.  As a part time

-13-

intern, Ms. O'Connor was not entitled to vacation time and did not receive any remuneration other than federal work-study funds.[6]  The Second Circuit concluded that Ms. O'Connor was not an employee for purposes of Title VII.  Be way of contrast, Consolmagno worked five days a week and was entitled to vacation and sick time.  Additionally, Ms. O'Connor had a separate entity – her university – that could and did in fact protect her from harassment by "arrang[ing] for her to complete her internship at another facility."  *O'Connor*, 126 F.3d at 114.  In this case there was no separate entity to protect Consolmagno from the alleged harassment.

Similarly, in *Tadros* a visiting lecturer at a medical school who received no salary, no insurance benefits, had no regularly assigned work hours, and had never delivered a lecture to students, brought suit under Title VII claiming that he had been discriminated against.  *Tadros v. Coleman*, 717 F. Supp. 996, 998 (S.D.N.Y. 1989)[7].  Unlike Dr. Tadros, Consolmagno had a substantial number of regularly assigned working hours that were strictly controlled and assigned by St. Raphael's School.

Additionally, in the instant action Consolmagno maintains that she did receive certain forms of remuneration, e.g., malpractice insurance, and  was wrongfully denied remuneration that was provided to other Program participants, i.e., a stipend and health insurance. Neither *O'Connor* nor *Tadros* included a similar claim.  Therefore, while the analysis contained in *O'Connor* and *Tadros* is important, there are sufficient factual differences between those cases and the instant action such that those cases do not automatically foreclose a finding that Consolmagno was an employee of the School.

---

[6] Ms. O'Connor's placement qualified as a work-study program for financial aid purposes.  *Id.*
[7] The Second Circuit relied upon the district court's recitation of the background of the case and "agree[d] with the district court's thoroughly reasoned conclusion that Tadros was not an employee entitled to the protection of Title VII . . . ." *Tadros*, 898 F.2d at 11.

iv.  Whether The Plaintiff Was Promised Remuneration

Consolmagno argues that even though she did not receive a stipend or health insurance like the rest of her peers, she was promised that remuneration like other Program participants as a matter of school policy.   She argues further that if she agreed not to seek a stipend or health insurance, she did so without knowing that those benefits were provided to Program participants as a matter of policy and consequently did not voluntarily abandon a known right.

In support of her contention that remuneration was promised, Consolmagno claims that the School's policy of paying Program participants, expressly stated in the Student Handbook, constituted a promise to remunerate her as one of those participants. The defendants counter by arguing that Consolmagno's admission to the Program was subject to her agreement that "she would have to forgo the stipend and health insurance provided to regular students as described in the Handbook." (Doc. # 109, at 3).   Even assuming the defendants are correct that Consolmagno agreed to forgo the stipend and health insurance, the question remains whether the circumstances surrounding that agreement satisfy the requirements of a waiver.

Waiver is defined as "the *intentional* relinquishment of a known right."  *DaimlerChrysler Ins. Co., LLC v. Pambianchi*, 762 F. Supp. 2d 410, 425 (D. Conn. 2011) (internal quotation marks omitted). Consolmagno maintains that when she agreed to forgo the stipend and health insurance she had not yet received a copy of the Student Handbook and did not know that other Program participants received that remuneration. Although the defendants maintain that the agreements the School reached with other Program participants are irrelevant, the Court finds that there is a factual question as to what Consolmagno knew about the benefits that were ordinarily given to program participants by St. Raphael's School when she agreed to forgo the

-15-

stipend and health insurance.  Since there is an unresolved factual issue in this case, summary

judgment is inappropriate if Consolmagno can demonstrate that the issue is both material and

genuinely in dispute.

   "A fact is material if it might affect the outcome of the suit under the governing law."

*Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (internal quotation marks omitted).  If

Consolmagno's agreement to forgo a stipend and health insurance was not a valid waiver, then

she may have been entitled to those benefits.  That type of entitlement can be viewed as a

promise of remuneration sufficient to demonstrate a "hiring" for purposes of Title VII. *See York*

*v. Association of the Bar of the City of New York*, 286 F.3d 122, 126 (2d Cir. 2002) ("the promise

of," among other things, "salary or other wages [or] employee benefits, such as health insurance"

is indicative of financial benefit).  The issue of whether Consolmagno validly waived the

School's remuneration may conclusively determine whether she was an employee for purposes of

Title VII.  Employment status in turn determines whether an individual can bring a Title VII suit.

Accordingly, the Court finds that the issue of whether  Consolmagno  waived any entitlement to

a stipend and health insurance is material.

   The Court also finds that the dispute over  Consolmagno's knowledge about Program

benefits is a genuine one.  "An issue of fact is genuine if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Roe*, 542 F.3d at 35 (internal quotation

marks omitted). Consolmagno stated in her affidavit that she did not know that her fellow

Program participants received a stipend and health insurance "until after [she] had actually

enrolled in the Program and been issued a copy of the School's handbook in which these matters

were addressed . . . ." [8]  (Doc. # 94, at 3, ¶ 4).  It is not the Court's role to assess the truthfulness of this statement at the summary judgment stage.

The Court finds that there is sufficient evidence in the record to support a conclusion by a reasonable jury that Consolmagno did not knowingly waive any right she had to a stipend and health insurance. The Court cannot know what Consolmagno knew.  Furthermore, the Court cannot make a judgment call about her credibility. The Court finds it sufficient to state that there is a genuine dispute concerning the material fact of Consolmagno's knowledge about the benefits usually given to Program participants when she agreed to forgo a stipend and health insurance.

Given this conclusion, the Court finds it unnecessary to consider whether the medical malpractice insurance policy that covered Ms. Consolmagno constituted remuneration or, if it did, whether that would be sufficient to show that a hire had occurred.  Instead, the Court will proceed directly to the second prong of  *O'Connor*.

v.  The *Reid* Test

The second part of the *O'Connor* analysis determines whether an individual is an employee under the traditional common-law agency test articulated in *Community for Creative Non-Violence v. Reid*.  490 U.S. 730, 751-52 (1989). *See O'Connor*, 126 F.3d at 115. Courts applying the *Reid* factors should "place special weight on the extent to which the hiring party controls the manner and means by which the worker completes her assigned tasks." *Foresta v. Centerlight Capital Management*, *LLC*, 379 F. App'x 44, 46 (2d Cir. 2010) (internal quotation

---

[8] This affidavit does not conflict with Consolmagno's deposition testimony because she was never asked when she learned that other students received a stipend and health insurance.  Accordingly, the rule that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony" has not been violated.  *Hayes v. N.Y.C. Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

marks omitted).  The defendants "admit that they controlled the manner and means of Plaintiff's participation as a student in the Program . . . ."  (Doc. # 92, at 53, ¶ 11a).  The Court finds this admission, which is fully supported by the evidence in the record, sufficient to demonstrate that if Consolmagno can establish that her situation was one that "plausibly approximate[d] an employment relationship;" *O'Connor*, 126 F.3d at 115; she would be considered an employee under common law agency principles. Therefore, the defendants' motion for summary judgment on the ground that Consolmagno was not their employee and thus is not entitled to Title VII's protection is denied.

### C.  The Retaliation Claim

The defendants have also moved for summary judgment as to Consolmagno's retaliation claim on the ground that her dismissal from St. Raphael's School was in accordance with School policy and was, therefore, not retaliation for engaging in the protected activity of reporting sexual harassment.

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."  42 U.S.C. § 2000e-2(a)(1).  Title VII also makes it unlawful for employers "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a). "The *McDonnell Douglas* burden shifting analysis . . . applies to retaliation claims brought pursuant to Title VII."  *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).

Under the *McDonnell Douglas* analysis the plaintiff "first bears the minimal burden of setting out a prima facie discrimination case, and is then aided by a presumption of

discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *McPherson v. N.Y.C. Department of Education*, 457 F.3d 211, 215 (2d Cir. 2006) (internal quotation marks omitted).   "[T]he standard for determining whether the evidence [is] sufficient to sustain the submission of  plaintiff's case to the jury [is] simply whether on the basis of that evidence, a factfinder could reasonably find the essential elements of a case of discrimination." *James v. N.Y. Racing Association*, 233 F.3d 149, 154 (2d Cir. 2000).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). Because "direct evidence of [an employer's] intent will only rarely be available . . . affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* (internal quotation marks omitted).  "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

Ultimately, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .  This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

i.  Prima Facie Case

In order to establish a prima facie case "[a] plaintiff claiming retaliation [in violation of Title VII] must prove: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse employment action."  *Gordon v. N.Y.C. Board of Education*, 232 F.3d 111, 113 (2d. Cir. 2000).  At the summary judgment stage the plaintiff's burden of establishing a prima facie case of employment discrimination is  "*de minimis*."  *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (internal quotation marks omitted).  "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

 "To prove that [s]he engaged in protected activity, the plaintiff need not establish that the conduct [s]he opposed was in fact a violation of Title VII."  *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).  "However, the plaintiff must demonstrate a good faith, reasonable belief that the underlying challenged actions of the employer violated the law."  *Id.* (internal quotation marks omitted).  "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances."  *Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

Under the circumstances it was entirely reasonable for Consolmagno to hold a good faith belief that the actions she alleges were taken by Geismar, who was both a member of the

admissions committee of St. Raphael's School and one of Consolmagno's supervisors, violated

the law.  The Student Handbook section on sexual harassment, which Consolmagno had read,

defined sexual harassment to include verbal "suggestive comments" and "inappropriate touching

of any kind," and contained a section entitled "Recourse under the Law."  (Doc. # 92, at 13,14).

Furthermore, the harassment alleged in this case went beyond mere spoken words and included

physical contact.  Even someone who was unsure of when spoken words violated the law could

have little doubt that unwanted physical contact crossed the line into the realm of sexual

harassment.

The record also demonstrates that the School knew that Consolmagno had engaged in a

protected activity. She reported it directly to Thompson, who then informed Noto.   Thus, the two

highest ranking members of St. Raphael's School and the President of Anesthesia Associates had

actual knowledge that Consolmagno complained of sexual harassment.  However, "implicit in

the requirement that the employer have been aware of the protected activity is the requirement

that it understood, or could reasonably have understood, that the plaintiff's opposition was

directed at conduct prohibited by Title VII." *Galdieri-Ambrosini*, 136 F.3d at 292.  This

requirement is satisfied because Thompson had read the School's sexual harassment policy,

including the portion stating that victims of sexual harassment have recourse under the law. The

record is sufficient to allow a reasonable jury to conclude that the defendants knew that

Consolmagno had engaged in a protected activity.

It is also clear that if Consolmagno is able to demonstrate that she was an employee of the

School, she suffered an adverse employment action when she was dismissed from the Program.

The dismissal from St. Raphael's School is similar to termination, which unquestionably

-21-

qualifies as an adverse employment action because it is much more "than a mere inconvenience" and constitutes a materially adverse change.  *See Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (including termination of employment in a list of examples that qualify as materially adverse actions).

 Finally, Consolmagno must show a causal connection between the adverse employment action (her dismissal), and the protected activity (reporting sexual harassment) in order to establish a prima facie case of retaliation. "Proof of the casual connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan*, 842 F.2d at 593. Consolmagno reported the sexual harassment incident on September 8, 2009, and was dismissed from the Program on October 15, 2009.  Thus, 37 days, or roughly five weeks, elapsed between the time of the complaint and Consolmagno's dismissal. This relatively short time period clearly falls within "the maximum time period that can give rise to an inference of causation . . . ."  *See Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) (stating that while there is no bright line rule for a maximum time period, "six weeks fits comfortably within any line we might draw").  Accordingly, the Court finds that Consolmagno has established a prima facie case of retaliation in violation of Title VII.

### ii.  Legitimate, Nondiscriminatory Reason

Since Consolmagno has established a prima facie case of retaliation, the burden now shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See McPherson*, 457 F.3d at 215.  The defendants assert that "Ms. Consolmagno's poor academic performance [was] the real reason for her dismissal [from St. Raphael's School]."  (Doc. # 86, at 36).  Specifically, the defendants contend that Consolmagno

was dismissed from St. Raphael's School in accordance with the policy set forth in the Student Handbook because she failed a third exam, Special Topics. The defendants' burden at this stage "is one of production, not persuasion " and "can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products*, *Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). The Court concludes that the defendants have met their burden by offering evidence that Consolmagno's final grade on the Special Topics exam was below the minimum passing score of 78 percent and that she had failed two previous exams.

### iii. Pretext

Under *McDonnell Douglas*, once the defendants have satisfied their burden of production by articulating a nondiscriminatory reason for the adverse employment action, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate nonretaliatory reasons for its action." *Kwan v. Andalex Group, LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Consolmagno does not dispute that the final score she was given on the Special Topics exam was a failing grade.  Instead, she argues that School administrators abused their discretion by ensuring that she failed that exam and maintains that a genuine issue of fact exists as to whether the Special Topics exam was fairly administered and reviewed. In support of her contention Consolmagno points initially to what she describes as Thompson's hostile reaction to

the original sexual assault complaint, i.e., saying "it's your word against his. What do you want me to do about this?" (Doc. # 91, at 27:25, 28:1). Consolmagno then notes that Thompson had previously told her that she "should complete [her] clinical training elsewhere." (*Id.* at 67:7-9). Consolmagno also takes issue with the defendants' response to her sexual harassment complaint, claiming that they failed to thoroughly investigate Geismar's actions and follow up with her. Consolmagno contends that these facts demonstrate animus toward her.

Consolmagno contends further that the Special Topics item analysis was manipulated to ensure that she failed. In support of that contention, she points to the wide discretion and limited standards that the reviewers had. Despite the fact that there were eighteen questions missed by more than half of the program participants, additional credit was given for only nine of those questions.

Consolmagno also cites the deposition testimony of Thompson as evidence of inconsistencies in the review process. Consolmagno's score of 61 was the only score indicated on an exam tally sheet that counted how many program participants got each question wrong. When asked why Consolmagno's score was the only one that was noted on the tally sheet, Thompson replied "I can't answer that question." (Doc. # 98, at 76:18-20). Another student who had received a raw score of 68 on the Special Topics exam would have had a failing grade of 77 even with the additional 9 points added to each student's raw score. An additional point was added to that student's score, however, so that the final grade was a 78, which was the minimum passing score. When asked at her deposition if she could explain why that student was awarded

an additional point to get to a total score of 78, Thompson responded,  "No, I can't."[9] (Doc. # 98, at 79:13-17). Taken together, these facts raise a genuine issue of material fact as to whether the Special Topics exam was administered fairly or manipulated to ensure that Consolmagno failed.

    This case is analogous to *Rosen v. Thornburgh*, 928 F.2d 528 (2d Cir. 1991).  There the Second Circuit found that summary judgment was inappropriate because the defendants' argument in support of summary judgment was predicated on the undisputed fact that the plaintiff had failed a required driving test and thus, according to the defendants, had been legitimately dismissed from a training program. The plaintiff put forward a "variety of circumstantial evidence" supporting his assertion that the driving evaluation was "a perfunctory exercise."  *Id.* at 533. Therefore, a genuine issue of material fact existed that made summary judgment inappropriate.  The Court concluded that the plaintiff had "produced sufficient evidence to survive the defendants' motion for summary judgment." *Id.* at 534.

    In this case the defendants' legitimate nondiscriminatory reason for dismissal is predicated on the assumption that the Special Topics exam was fair. Consolmagno has pointed to a variety of circumstantial evidence supporting her contention that the Special Topics exam was not fairly administered or reviewed. While the defendants argue that Consolmagno's raw score of 61 was well below the scores her peers received and contend that the review process was proper, the fact remains that shortly after Consolmagno complained of sexual harassment, St. Raphael's School administered an exceptionally difficult test and then conducted a review process of the results which could not be fully explained by the Program Director at her deposition. The end

---

[9]In a supplemental affidavit filed seven months after her deposition Thompson provided an explanation as to why one additional point was awarded to three of the students who took the Special Topics exam..

result of this process was Consolmagno's dismissal from the Program. In light of all the evidence in this case, the Court finds that a genuine dispute of material fact exists as to the issue of pretext. Consolmagno has produced evidence sufficient to demonstrate "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 846. "From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.*[10] Accordingly, summary judgment as to the retaliation claim is denied.

### D.  Lost Future Earnings

Finally, the defendants have moved for summary judgment with respect to Consolmagno's claim for lost future earnings, asserting that the claim is unduly speculative. "In order to recover damages, a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages." *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992). The plaintiff "need not prove the amount of loss with mathematical precision; but the jury is not allowed to base its award on speculation or guesswork." *Id.* The questions in this case are whether Consolmagno would have become a CRNA and secured employment as a CRNA.

The record demonstrates that Consolmagno has difficulty taking exams. It is undisputed that Consolmagno failed two exams at St. Raphael's School prior to the time she complained of sexual harassment. Even assuming that the School unfairly administered and reviewed the Special Topics exam to ensure her failure, it is quite possible that Consolmagno would have

---

[10]The Second Circuit has noted that "[t]he determination of whether retaliation was a but-for cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact." *Kwan*, 737 F.3d at 846 n.5 (internal quotation marks omitted).

failed a third exam of her own accord.  Even if she had successfully completed the Program, Consolmagno would have had to pass the NCE, an exam that she had failed on sixteen previous occasions.  While she may have been better prepared for the NCE due to her completion of the Program, trying to determine whether Consolmagno would have ultimately passed the NCE and become a CRNA appears to be little more than guesswork.

The defendants further contend that even if Consolmagno had become a CRNA, she would have had to secure a job as a CRNA.  The factual record, however, contains evidence that Anesthesia Associates may have hired Consolmagno if she had completed the Program and passed the NCE.  First, the minutes from Anesthesia Associates' February 10, 2009 corporate meeting contain a line asking whether Consolmagno should be "hire[d] . . . with (a) 2 year contract and no sign on bonus or (b) 1 year contract with no pay as necessary requirement for board eligibility?"  (Doc. # 92, at 26). Second, in an email Van Ess sent to Consolmagno, Van Ess explicitly stated that "[u]pon graduation, you will be offered employment by Anesthesia Associates of New Haven."  (Doc. # 92, at 70.)

The defendants have offered evidence that the word "hire" in the Anesthesia Associates' minutes is a typo, and that the minutes should read "admit her as a special student" instead. (Doc. # 90, at 22:1-10). Even if the Court accepts the argument that the word "hire" in the corporate meeting minutes was a typo, the email exchange between Van Ess and Consolmagno is enough to raise a legitimate factual dispute about whether Anesthesia Associates would have hired Consolmagno if she became a CRNA.  Because the Court must draw all reasonable inferences in favor of the non-moving party, the Court will infer for the purposes of this motion that Anesthesia Associates would have hired Consolmagno if she had  become a CRNA.

-27-

Nevertheless, the Court finds that whether Consolmagno would have graduated from the Program and passed the NCE is unduly speculative. Consolmagno's inability to pass at least two of the first five examinations that she took and her history of difficulty with the NCE would still force a jury to speculate and ultimately guess whether she would have passed.  Therefore, the defendants' motion for summary judgment as to Consolmagno's lost future earnings claims is granted.


III.  CONCLUSION

For the forgoing reasons, the defendants' motion for summary judgment (**doc. # 85**) is **DENIED IN PART and GRANTED IN PART**.  The motion is denied as to the defendants' claim that the plaintiff is barred from recovery under Title VII because she was not an employee of the defendants, and as to the plaintiff's retaliation claim. The motion is granted as to the plaintiff's lost future earnings claim.


**SO ORDERED** this 18th  day of December, 2014.


_____/s/ DJS_____
              DOMINIC J. SQUATRITO
              UNITED STATES DISTRICT JUDGE